**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

|  |  |  |
|---|---|---|
| **KALSEC, INC.** | ) | **Case No. 1:23-cv-01137** |
|  | ) |  |
| *Plaintiff,* | ) |  |
|  | ) | **Judge: Hon. Jane M. Beckering** |
| **v.** | ) |  |
|  | ) |  |
| **FENCHEM, INC. d/b/a FENCHEM USA** | ) |  |
|  | ) |  |
| *Defendant.* | ) |  |
|  | ) |  |

Homayune A. Ghaussi (P63028)
Timothy H. Smith (P85528)
Warner Norcross + Judd LLP
2715 Woodward Ave., Ste. 300
Detroit, MI 48201
(313) 546-6000
hghaussi@wnj.com
tsmith@wnj.com

*Counsel for Plaintiff*

Mingwei Yan (P80734)
Mingwei Yan, PLLC
455 E. Eisenhower Parkway, Suite 300
Ann Arbor, MI 48108
(732) 800-9912
yanpllclaw@gmail.com

Yaou Li (P86640)
YL International Law Group
455 E. Eisenhower Parkway, Suite 300
Ann Arbor, MI 48108
(832) 693-9145
yli@yi-lg.com

*Counsel for Defendant*

**DEFENDANT'S BRIEF IN SUPPORT OF ITS RESPONSE
IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

# **TABLE OF CONTENTS**

I.    FACTUAL BACKGROUND ................................................................................. 1

    i.   Kalsec and Fenchem Maintained a Longstanding Business Relationship, and Kalsec Regarded Fenchem as a Reliable Supplier Prior to the Dispute Giving Rise to this Lawsuit ............................................................................................................. 1

    ii.  Kalsec Purchased Tocopherols from Fenchem Through Blanket Orders with Deliveries Scheduled on Mutual Agreed Dates ............................................................. 2

    iii. In February 2022, the Price of Tocopherols Skyrocketed Due to Russia's Full-Scale Invasion of Ukraine ...................................................................................... 3

    iv.  Fenchem Was Unable to Deliver the Tocopherols at $31/kg Due to the Marked Increased Costs of Tocopherols Caused by Russia's Full Invasion of Ukraine .......... 4

    v.   Fenchem Paid $61/kg for the Tocopherols Sold at $62/kg, and Biotek Paid $56.5 in Addition to Expenses ........................................................................................ 7

II.   APPLICABLE STANDARD ............................................................................. 8

III.  AUTHORITIES AND ARGUMENT ................................................................ 9

    A. Kalsec's Breach of Contract Claim………………………………………………..9

    i.   Fenchem and Kalsec did not reach a mutual agreement on the deliveries of Tocopherols ....................................................................................................... 9

    ii.  A genuine dispute of material fact exists as to whether Kalsec submitted the $62/kg purchase orders on the top of the Blanket Order ........................................................ 10

    iii. A genuine dispute of material fact exists as to whether Fenchem and Kalsec agreed to pause performance under the Blanket Order ........................................................ 11

    iv.  Kalsec failed to demonstrate an absolute and unequivocal repudiation constituting a substantial impairment of the entire Blanket Order ................................................ 12

    B. Fenchem's Impracticability Defense………………………………………………14

    i. The full-scale invasion of Ukraine by Russia ......................................................... 14

    ii. Kalsec's argument that Fenchem's performance was not vitally different .......... 15

    iii. Kalsec's argument that the price increase would not have a severe impact ........ 17

    iv. Kalsec's argument that Fenchem did not show the real costs of Tocopherols ..... 18

**v. Kalsec's argument that Fenchem cannot show the invasion caused the price increase**.........................................................................................................**18**

**vi. Kalsec's argument that Fenchem did not prevent the alleged impracticability .. 20**

**vii.Kalsec's argument that Fenchem has no proof of fair allocation**..........................**21**

**IV.**     **CONCLUSION** .................................................................................................**21**

## I.    FACTUAL BACKGROUND

### i.    Kalsec and Fenchem Maintained a Longstanding Business Relationship, and Kalsec Regarded Fenchem as a Reliable Supplier Prior to the Dispute Giving Rise to this Lawsuit.

Kalsec, a Michigan-based company in the food industry, manufactures intermediate products for pet food and food companies. [Ex. 1, 24:8 – 12; Ex. 2, 29:6 – 12].

Fenchem is a distribution company based in California that purchases and re-sells products. [Ex. 3, 20:1 – 10].

From 2013 to 2021, Kalsec and Fenchem conducted business together for approximately eight years. [ECF # 1, ¶ 8]. During that time, the parties had a longstanding business relationship, and Kalsec regarded Fenchem as a reliable supplier. [Ex. 2, 115:2 – 19].

Starting in 2013, Fenchem began to supply tocopherols to Kalsec. [Ex. 1, 36:8 – 12]. Tocopherols are a class of vitamin E compounds that derive from soybeans – specifically, from oil extracted through soybean crushing [ECF # 35-10, ¶ 4; Ex. 2, 30:22 – 31:7, 85:20 – 86:5]. The specific product at issue in this case is non-GMO mixed tocopherols 70% with sunflower oil ("Tocopherols"), consisting of a blend of 70% tocopherols and 30% sunflower oil. [Ex. 2, 31:9 – 12, 85:20 – 86:13]. Kalsec incorporated the Tocopherols in antioxidant product it sells to its customers. [Ex. 1, 27:7 – 12; Ex. 2, 28:25 – 29:5].

Both Ukraine and Russia are the major exporters of sunflower oil in the world. [Ex. 2, 95:6 -13]. The Black Sea region, which includes both countries, is a significant hub for the production and export of sunflower-based products. [*Id.* at 95:21 – 96:5]. Kalsec acknowledges that a war between Russia and Ukraine would impact the supply chain of sunflower oil. [*Id.* at 95:21 – 96:24]. Indeed, an internal Kalsec's document observed that "Ukraine and Russia produce 60% of the

worlds sunflower oil so if the conflict happens then we could have a super tight market and shutdowns of ports in that region." [Ex. 6, Kalsec 2346].

This lawsuit arises out of the first and only dispute between Kalsec and Fenchem during the course of their eight-year business relationship. [Ex. 1, 37:7 – 9].

### ii.    Kalsec Purchased Tocopherols from Fenchem Through Blanket Orders with Deliveries Scheduled on Mutually Agreed Dates.

When purchasing Tocopherols from Fenchem, the parties would first discuss Kalsec's projected needs. [Ex. 2, 32:23 – 33:5]. Following the discussions, Kalsec would submit a blanket order to Fenchem specifying the total volume of Tocopherols to be purchased. [*Id.* at 33:3 – 5, and 33:14 – 21]. The specific delivery dates, however, were not fixed at the time of the blanket order and would be determined later. [*Id.* at 33:19 – 21, 49:24 – 50:5; Ex. 1, 50:3 - 10].

To call for deliveries, Kalsec would send individual release orders under the blanket orders. [Ex. 2, 40:13 – 41:5]. Kalsec acknowledges that the delivery dates are an important term under these orders. [*Id.* at 37:22 – 38:6; Ex. 1, 51:11 – 14]. Before sending the release orders, Kalsec would confirm the delivery dates for a specific amount of Tocopherols with Fenchem. [Ex. 2, 41:18 – 42:16]. If Fenchem was unable to meet a requested delivery date, Kalsec would commonly agree to adjust the date to one that worked for both parties, in part due to their very good relationship. [*Id.* at 43:8 – 44:21, 65:9 - 14]. Once Fenchem confirmed the delivery dates, Kalsec would send corresponding purchase orders accordingly. [*Id.* at 42:8 – 11]. Fenchem would then accept the release orders by scheduling the deliveries. [Ex. 17, pp. 1–2]. Notably, even after issuing the release orders, Kalsec would make further adjustments to delivery timing if necessary. [*Id.*].

However, if Fenchem could not deliver the requested Tocopherols, no agreement between the parties would be formed. [Ex. 1, 52:8 – 53:9]. In fact, even when delivery dates had been agreed upon, Kalsec would still work with Fenchem on the delivery dates if Fenchem needed more

time. [Ex. 2, 47:18 – 48:5]. This cooperative approach reflected the parties' strong and collaborative relationship, which continued without issue until 2022, when Steven Buell assumed responsibility for managing the relevant products from Catherine Roué at Kalsec. [*Id.* 43:18 – 20; Ex. 1, 62:16 – 63:15].

Notably, the parties did not require all deliveries to occur within the same calendar year as the blanket order. For example, Fenchem delivered Tocopherols to Kalsec in January 2022 pursuant to the blanket order issued for 2021. [Ex. 3, 35:15 – 36:4].

### iii.    In February 2022, the Price of Tocopherols Skyrocketed Due to Russia's Full-Scale Invasion of Ukraine.

In August 2021, Kalsec submitted a blanket order numbered 6013522 ("Blanket Order") to purchase 35,150 kgs of Tocopherols from Fenchem at a unit price of $31/kg. [Ex. 4, Kalsec 45; Ex. 1, 51:3 - 6]. The Blanket Order did not specify that all deliveries were to occur in 2022 and did not include any specific delivery dates. [*Id.*; Ex. 1, 50:3 – 10]. Fenchem approved the Blanket Order. [Ex. 3, 47:8 – 15].

In mid-February 2022, the tocopherol market became increasingly volatile in reaction to the buildup of Russian troops near the Ukraine border on the eve of Russia's full-scale invasion. [Ex. 5, 16:3 – 6; ECF # 51-9, p. 11 - 12]. During this period, the prices of sunflower oil and soybean oil – raw materials used in the production of Tocopherols – began to rise sharply. [Ex. 5, 16:7 – 17:15]. As a result, the market price of Tocopherols skyrocketed to $55/kg. [Ex. 7, Kalsec 685].

Reflecting the impact of these disruptions, Kalsec acknowledged the strained market conditions in a February 9, 2022, email to Fenchem Kalsec, expressing thanks for the "continuous support during these challenging times on tocopherols." [ECF # 51-9, pp. 11 – 12]. Around the same time, an internal Kalsec's communication confirmed that the "tocopherol market right now is in a crisis." [Ex. 8, Kalsec 1444].

The full-scale invasion caused severe shortages of raw materials and supplies of vegetable oil, leading to volatile and daily price increase for tocopherols. [ECF # 35-10, ¶ 9]. The price of Tocopherols further increased to $62/kg after Russia's full-scale invasion of Ukraine on February 24, 2022. [Ex. 9, Kalsec 62]. Kalsec also confirmed that $62/kg was the best deal in March 2022 with its approved suppliers. [Ex. 1, 97:14 – 17].

Although regional conflicts between Russia and Ukraine had been ongoing in the Crimea and Donbas areas since 2014, these conflicts did not significantly impact the supply of tocopherols and the raw materials until the full-scale invasion of Ukraine. [ECF # 35-10, ¶ 5].

### iv.    Fenchem Was Unable to Deliver the Tocopherols at $31/kg Due to the Marked Increased Costs of Tocopherols Caused by Russia's Full Invasion of Ukraine.

On February 16, 2022, fully aware that the market price of Tocopherols had surged to $55/kg and that Fenchem was unable to supply the Tocopherols at $31/kg, Kalsec issued a call for two deliveries totaling 13,300 kgs of Tocopherols under the Blanket Order, scheduled for March and April. [Ex. 10, 143:4 – 9; ECF # 51-9, pp. 3 – 4, 9]. Kalsec also sought confirmation of three other deliveries in June, September, and October [ECF # 51-9, pp. 3 – 4].

Fenchem did not confirm the P.O.s 6016488 and 6016489 because the sharp increase in tocopherol costs rendered it impossible and impracticable for Fenchem to supply tocopherols at the price of $31/kg. [Ex. 2, 58:2 – 16; Ex. 1, 76:19 – 77:1; ECF # 35-10, ¶ 11]. Instead, following Kalsec's request, the parties engaged in discussions regarding the requested deliveries, and Fenchem understood that Kalsec had agreed to pause performance on the Blanket Order. [Ex. 10, 100:21 – 101:3; 172:3 – 23]. Around the same time, Kalsec had internally discussed to "keep $31/kg tocopherols on hold." [Ex. 13, Kalsec 613; Ex. 1, 120:21 – 121:1]. As such, Fenchem did not accept the release orders. [Ex. 10, 142:16 – 18; Ex. 1, 78:3 - 5].

On March 2, 2022, in an effort to mitigate further price increases, Fenchem informed Kalsec that it could deliver Tocopherols at $55/kg, which was then the best price. [ECF # 51-19, p. 2]. Around this time, Steve Buell assumed responsibility for managing the Fenchem account at Kalsec. [ECF # 51-21, p. 3].

On March 8, 2022, Kalsec attempted to proceed with deliveries at $31/kg under the P.O.s 6016488 and 6016489, but proposed a modification to the shipping terms. [ECF # 51-21, p. 3]. In response, on March 10, 2022, Fenchem informed Kalsec that the price of Tocopherols had risen to $62/kg (EXW-China) or $70/kg (FOB-California). [ECF # 51-21, p. 2]. Fenchem further stated that it was unable to address the other three requests for deliveries in June, September, and October due to "conditions outside [Fenchem's] control" until approximately two months prior to the requested delivery dates. [*Id.*]. Fenchem emphasized that it would resume deliveries once the conditions improved. [*Id.*]. As such, Fenchem did not confirm the delivery dates for the requested deliveries in June, September, and October.

In fact, at all relevant times, Fenchem expressed its willingness to deliver the Tocopherols at $31/kg if it could. [Ex. 10, 84:12 – 22]. Fenchem informed Kalsec that the Blanket Order would remain open until such time Fenchem could supply the goods at $31/kg. [*Id.*; Ex. 1, 70:2 – 71:12].

In its March 10, 2022, email, Fenchem invited Kalsec to send "[r]evised contracts" reflecting the new price. [ECF # 51-25, p.7]. Later the same day, Kalsec responded by asking Fenchem a series questions in order to "issue a new PO for 13,300 kgs." [*Id.* at p.8]. Kalsec acknowledges that it was willing to issue a new purchase order. [Ex. 1, 105:6 – 14]. After receiving Fenchem's responses, Kalsec issued new purchase order, which Fenchem accepted. [ECF # 51-25, pp. 5 - 6]. At no point did Kalsec indicate that it issued the new purchase order under duress or protest. [*Id.*; Ex. 1, 104:22 – 105:5].

On March 14, 2022, Kalsec sent revised purchase orders to purchase Tocopherols at $62/kg and, for the first time, asserted that it was issuing the purchase orders under significant duress and under protest. [ECF # 51-25, pp. 3 - 4]. Kalsec emphasized that the purchase order did not alter or replace the Blanket Order. [*Id.*; Ex. 1, 99:7 – 16]. At the same time, Kalsec acknowledges that it submitted the purchase order as separate and distinct to the Blanket Order. [Ex. 1, 100:9 – 11].

Upon discovery, on March 15, 2022, Steven Buell instructed Kalsec's accounts payable department to halt payments to Fenchem, evidently as a means to gain leverage in the ongoing negotiation over Tocopherols supply. [Ex. 12, Kalsec 465; Ex. 1, 111:14 – 112:16].

On March 16, 2022, Fenchem responded to Kalsec's assertion and acknowledged the parties' "new contract," indicating its understanding that the Blanket Order had been paused and that the March 14 purchase orders constituted new agreements. [ECF # 51-23, p. 4]. Kalsec did not object to the characterization of the "new contract." [*Id.*, at p. 3]. Fenchem also emphasized that it was not acting out of greed, noting that it had previously supplied Tocopherols to Kalsec at the price of $26.5/kg even when the market price had risen to $50/kg. [*Id.*, at p. 4].

In July 2022, Kalsec approached Fenchem to purchase an additional 4,750 kgs of Tocopherols at a discounted price of $62/kg, stating that the price "would work for both." [Ex. 11, at p. 2]. Kalsec acknowledges that the additional 4,750 kilograms were ordered on the top of the Blanket Order. [Ex. 1, 125:14 – 20].

Fenchem accepted the orders and fulfilled all the $62/kg orders. Thereafter, Kalsec did not contact Fenchem to request deliveries of Tocopherols under the Blanket Order, despite the fact that Fenchem still had time remaining to perform. [Ex. 1, 138:25 – 139:7, 141:8 – 12].

Unbeknownst to Fenchem, Kalsec reached out to Wilmar in March 2022, and placed an order for the same Tocopherols at $62/kg – a price higher than the $55/kg that Fenchem had offered

to Kalsec in early March 2022. [Ex. 1, 80:10 – 13, 84:23 – 85:2, 86:10 – 14, and 133:6 - 11]. Kalsec acknowledged that it eventually purchased 13,300 kilograms of Tocoperols from Wilmar at the price of $62/kg in April 2022. [Ex. 1, 171:13 – 19; ECF # 51-1, p. 19]. Significantly, Kalsec requested Wilmar to deliver the Tocopherols between April and June 2022 – an earlier timeframe than the delivery dates it had requested from Fenchem. [ECF #s 51-30 and 51-31].

> **v.    Fenchem Paid $61/kg for the Tocopherols Sold at $62/kg, and Biotek Paid $56.5/kg in Addition to Expenses.**

Fenchem does not manufacture any products in the United State; and it solely operates as a distributor. [Ex. 10, 21:7 – 15]. Fenchem purchases certain products from its foreign affiliate, Fenchem Biotek ("Biotek"), which is based in China. [ECF # 51-1, p. 5]. Biotek does not own any part of Fenchem, neither does Fenchem own any part of Biotek. [Ex. 3, 23:1 – 6].

When a Fenchem salesperson identifies a new U.S. customer, they gather data on the customer's material requirements, specifications, target price, and delivery schedule, then report this information to Fenchem's general manager. [Ex. 10, 23:16 – 24:16]. The salesperson also coordinates with a Biotek's material category manager to verify pricing and terms before finalizing the customer's request. [*Id.* at 42:8 – 23].

Biotek offered the price based on the cost as well as the market trend. [Ex. 14, 29:8 – 15]. At the same time, Fenchem would make input on the market price to Biotek based on the feedback from the customers. [*Id.* at 30:2 – 12]. When Fenchem purchased tocopherols from Biotek, Biotek issued invoices to Fenchem. [Ex. 3, 14:13 – 23].

For the Tocopherols sold to Kalsec at \$62/kg, Fenchem paid \$61/kg and other expenses, including storage fees and administrative cost. [Ex. 3, 127:10 – 128:8; Ex. 15]. Biotek paid roughly \$56.5/kg[1]. [Ex. 16]. On the top of \$56.5/kg, Biotek also paid other related expenses. [*Id.*].

Despite claiming that it suffered damages by purchasing Tocopherols at a higher price, Kalsec has failed to show that it did not pass these costs on to its customers. [Ex. 1, 123:13 – 24].

On October 30, 2023, Kalsec initiated this lawsuit against Fenchem for breach of contract.

## II.    APPLICABLE STANDARD

Summary judgment is properly granted where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A "material fact," for summary judgment purposes, is one that might affect the outcome of the suit. *Barry v. O'Grady,* 895 F.3d 440 (6th Cir. 2018).

"A court ruling on a motion for summary judgment must consider all the facts in the light most favorable to the nonmovant and must give the nonmovant the benefit of every reasonable inference." *Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 619 (6th Cir. 1999). The Court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in the favor of the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986); *Minadeo v. ICI Paints,* 398 F.3d 751, 756 (6th Cir.2005). Where material facts specifically averred by one party contradict facts averred by party moving for summary judgment, motion must be denied. FED. R. CIV. P. 56(a); *see also Gupta v. Melloh*, 19 F.4th 990 (7th Cir. 2021).

---

[1] According to Exchange-Rates.org, the exchange rate for Chinese Renminbi (RMB) into U.S. Dollars (USD) on March 11, 2022, was 1 CNY = 0.15773 USD. *See* https://www.exchange-rates.org/exchange-rate-history/cny-usd-2022-03-11.

### III.    AUTHORITIES AND ARGUMENT

### A. Kalsec's Breach of Contract Claim

Kalsec seeks summary judgment on its breach of contract claim against Fenchem, alleging that Fenchem repudiated the Blanket Order by demanding a higher price for the Tocopherols. However, Kalsec overlooks numerous genuine disputes of material fact, as detailed below.

### i.    Fenchem and Kalsec did not reach a mutual agreement on the deliveries of Tocopherols.

In its Motion for Summary Judgment, Kalsec attempts to recast the narrative and asserts that Fenchem breached the contract by demanding a higher price for the Tocopherols under the Blanket Order. However, this argument overlooks the critical facts that 1) Fenchem did not accept Release Order Nos. 6016488 and 6016489, and 2) parties never reached a mutual agreement on the requested deliveries for Tocopherols in June, September, and October 2022.

In order to form a valid contract, under Michigan law, there must be a meeting of the minds on all the material facts, and "meeting of the minds" is a figure of speech for mutual assent. *High v. Cap. Senior Living Props. 2-Heatherwood, Inc.*, 594 F. Supp. 2d 789 (E.D. Mich. 2008). A course of dealing can supplement a contractual agreement. *Mersen USA - Midland-MI Inc. v. Graphite Machining Servs. & Innovations, LLC,* No. 12-10961, 2013 WL 3879679, at *4 (E.D. Mich. July 26, 2013).

A "course of dealing" is a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct. Mich. Comp. Laws § 440.1303 (2). Under Michigan law, a course of dealing between the parties in trade in which they are engaged is relevant in ascertaining the meaning of the parties' agreement, may give particular

meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement. Mich. Comp. Laws § 440.1303 (4).

Here, Kalsec acknowledges that the delivery dates were a material term. [Ex. 1, 51:11 – 14; Ex. 2, 37:22 – 38:6]. Kalsec further admits that if Fenchem could not deliver the requested Tocopherols, no agreement would be formed. [Ex. 1, 52:8 – 53:9]. It is undisputed that the Blanket Order does not specify any delivery dates. [Ex. 4, Kalsec 45; Ex. 1, 50:3 - 10]. Accordingly, the course of dealing between Fenchem and Kalsec is relevant to supplement and interpret the terms of the agreement.

Under the parties' established course of dealing, Kalsec would first confirm with Fenchem the delivery dates for specific quantities of Tocopherols. [Ex. 2, 41:18 – 42:15]. Upon Fenchem's confirmation, Kalsec would then issue corresponding purchase orders for the deliveries. [*Id.* at 42:8 – 11]. If Fenchem accepted the release orders, it would schedule deliveries accordingly. [Ex. 17, pp. 1–2].

As shown above, Fenchem did not accept the Release Orders Nos. 6016488 and 6016489, nor did Fenchem confirmed the requested delivery dates in June, September, and October in 2022. Therefore, no meeting of minds was formed with respect to these deliveries, and Fenchem and Kalsec did not reach a mutual agreement on the deliveries of Tocoherols.

ii.    **A genuine dispute of material fact exists as to whether Kalsec submitted the $62/kg purchase orders on the top of the Blanket Order.**

In its Motion, Kalsec contends that the price increase to $62/kg constituted a repudiation and breach of contract. However, a genuine dispute of material fact exists as to whether these purchases were made under the Blanket Order or pursuant to a separate agreement.

On March 14, 2022, Kalsec sent purchase orders to purchase Tocopherols at $62/kg. [ECF # 51-25, pp. 3 - 4]. Kalsec emphasized that the purchase order did not alter or replace the Blanket

10

Order. [Ex. 1, 99:7 – 16]. Kalsec also acknowledges that the $62/kg purchase order was submitted as separate and distinct to the Blanket Order. [*Id.* at 100:9 – 11].

Likewise, In July 2022, Kalsec approached Fenchem to purchase an additional 4,750 kgs of Tocopherols at a discounted price of $62/kg, stating that the price "would work for both." [Ex. 11, p. 2]. Kalsec acknowledges that this purchase was made on the top of the Blanket Order and not as part of it. [Ex. 1, 125:14 – 20].

Therefore, given Fenchem's understanding that the Blanket Order was paused, and Kalsec's acknowledgment that the $62/kg purchase orders were submitted as separate, distinct, or in addition to the Blanket Order, a genuine issue of material fact exists as to whether Kalsec intended the $62/kg orders to be independent of the Blanket Order.

### iii. A genuine issue of material fact exists as to whether Fenchem and Kalsec agreed to pause performance under the Blanket Order.

Under Michigan law, it is well established that written contracts may be modified by subsequent oral agreements if otherwise valid. *Grand Traverse Fruit & Produce Exch. v. Thomas Canning Co.*, 200 Mich. 95, 97, 166 N.W. 878, 879 (1918). Subsequent oral modifications of a written contract may be valid notwithstanding a contract provision indicating that only written modifications are effective. *In re R & D Contracting, L.L.C.*, 383 B.R. 890, 898 (Bankr. E.D. Mich. 2008). The Blanket Order at issue contains no language prohibiting modification by subsequent oral agreement.

Fenchem contends that, following Kalsec's request to confirm delivery dates for Tocopherols under the Blanket Order, the parties engaged in discussions regarding the requested deliveries, and it was Fenchem's understanding that Kalsec had agreed to pause performance under the Blanket Order. [Ex. 10, 100:21 – 101:3; 172:3 – 23]. Around the same time, Kalsec internally discussed to "keep $31/kg tocopherols on hold." [Ex. 13, Kalsec 613; Ex. 1, 120:21 – 121:1].

Additionally, Fenchem informed Kalsec that the Blanket Order would remain open until such time as Fenchem could supply the Tocopherols at $31/kg. [*Id.*; Ex. 1, 70:2 – 71:12].

Moreover, as shown above, Kalsec acknowledges that its purchase orders at $62/kg were submitted as separate, distinct, and/or on top of the Blanket Order. This acknowledgment further supports Fenchem's position that the parties mutually agreed to pause performance under the Blanket Order.

Accordingly, a genuine issue of material fact exists as to whether the parties mutually agreed to pause performance under the Blanket Order.

### iv.    Kalsec failed to demonstrate an absolute and unequivocal repudiation constituting a substantial impairment of the entire Blanket Order.

Kalsec contends that Fenchem repudiated the Blanket Order and thereby breached the contract. However, Kalsec overlooks several critical factual disputes and misapplies the applicable legal standard.

A repudiation must be absolute or unequivocal, and Courts determine whether anticipatory repudiation has occurred on a case-by-case basis, depending on the particular contract language involved. *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 599 (6th Cir. 2004).

Here, in its March 10, 2022, email to Kaslec, Fenchem stated that it "will be able to" review the additional deliveries "approximately two months prior to your original requested delivery date…" [ECF # 51-21, p. 2]. Fenchem neither rejected performance nor demanded a price increase for the future deliveries. To the contrary, Fenchem's communication demonstrates a clear willingness to perform, subject only to operational timing.

Even assuming *arguendo*, a mere expression of uncertainty is insufficient establish anticipatory breach. Indeed, Kalsec itself concedes that Fenchem never stated it "would never

supply" Tocopherols in the future. [Ex. 1, 70:2 – 13]. Therefore, Kalsec has failed and cannot establish that Fenchem's statements constituted an absolute and unequivocal repudiation.

Furthermore, Kalsec overlooks that the Blanket Order constitutes an "installment contract," which requires delivery of goods in separate lots to be separately accepted. Mich. Comp. Laws § 440.2612(1). To determine whether a breach constitutes substantial impairment of entire installment contract, under Uniform Commercial Code (UCC), courts must consider the cumulative effect of the breaching party's performance under the contract, based on totality of circumstances. *Id.*; *see also Midwest Mobile Diagnostic Imaging, L.L.C. v. Dynamics Corp. of Am.*, 965 F. Supp. 1003 (W.D. Mich. 1997), aff'd sub nom. *Midwest Mobile Diagnostic Imaging v. Dynamics Corp. of Am.*, 165 F.3d 27 (6th Cir. 1998).

Here, even assuming Kalsec paid a higher price for the first two shipments, it has failed to demonstrate how the receipt of the conforming Tocopherols from Fenchem constitutes a substantial impairment of the entire Blanket Order. This is especially true in light of Fenchem's continued willingness to perform the future deliveries, as reflected in its March 10, 2022, communications.

Moreover, under Michigan law, an aggrieved party reinstates the contract if it accepts a nonconforming installment without seasonably notifying of cancellation or if it brings an action with respect only to past installments or demands performance as to future installments. Mich. Comp. Laws § 440.2612(3).

Kalsec acknowledges that it never canceled the Blanket Order at any time. [Ex. 1, 72:21 – 23, 73:23 – 74:9]. Even if the first two shipments were somehow nonconforming and substantially impaired the value of the Blanket Order, Kalsec reinstated the Blanket Order by accepting the first two shipments without seasonably notifying Fenchem of cancellation.

Therefore, under these circumstances, Kalsec's conduct confirms that it reinstated the Blanket Order, thereby waiving any claim of total breach based on the earlier shipments.

Notably, Kalsec purchased 13,300 kilograms of Tocopherols at $62/kg for delivery between April and June 2022, without providing any prior notice to Fenchem. In doing so, Kalsec deprived Fenchem of a fair and reasonable opportunity to perform under the Blanket Order in accordance with the requested delivery schedule, which called for shipments in June, September, and October 2022. Accordingly, a genuine issue of material fact exists as to whether Kalsec incurred any damages as a result of its purported "cover" purchase of Tocopherols from Wilmar.

### B. Fenchem's Impracticability Defense.

Kalsec seeks summary judgment on Fenchem's impracticability defense, alleging that Fenchem's affirmative defense fails for several reasons. However, Kalsec misapplies the facts of this case and relies on case law that is materially distinguishable, as detailed below.

### i. The full-scale invasion of Ukraine by Russia.

In its Motion, Kalsec contends that the full-scale invasion of Ukraine by Russia was a foreseeable event, despite the fact that the full-scale invasion of Ukraine was an unprecedented event since World War II - nearly 80 years ago.

In support of its argument, Kalsec first cites the *Lockheed Martin Corporation v. Howmet Aerospace Inc.* case. However, the *Lockheed Martin Corporation* case does not support Kalsec's position. In the TRO hearing, the district court did not conclude that the full-scale invasion of Ukraine by Russia in February 2022 was foreseeable; rather, it found that it could not conclusively determine at that stage whether the war in Ukraine constitutes a supervening event that would excuse performance. *Lockheed Martin Corp. v. Howmet Aerospace Inc.*, No. 4:23-CV-01204-O,

2023 WL 9503471, at *10 (N.D. Tex. Dec. 12, 2023). The court's decision was limited to the preliminary stage of the proceedings and did not reach the merits of the impracticability defense.

Secondly, Kalsec attempts to establish foreseeability through witness testimony, asserting that Russia's aggressive behavior had been common knowledge for years. However, generalized geopolitical tensions or prior localized conflicts are not equivalent to predicting a full-scale invasion. Notably, Kaslec elicited such testimony through misleading questions, omitting critical context. Specifically, Kalsec intentionally concealed the fact at the deposition that even after massing approximately 80,000 troops near the Ukrainian border, Russia publicly insisted it was merely conducting military exercises and repeatedly denied any intention to invade. See *Russian invasion of Ukraine*, https://en.wikipedia.org/wiki/Russian invasion of Ukraine.

Most importantly, Fenchem neither anticipated nor foresaw a full-scale invasion of Ukraine by Russia, nor did it assume the risk of such an invasion. [ECF # 35-10, ¶ 6]. The absence of this assumption was fundamental to Fenchem's continued operations in supplying tocopherols to Kalsec since 2013. [*Id.* at ¶ 5]. While localized conflicts in Crimea and the Donbas region had persisted for years, Fenchem did not indicate or reasonably foreshadow the unprecedented scale and impact of the 2022 invasion.

Therefore, Kalsec has failed to establish that there is no genuine dispute that the invasion was foreseeable.

### ii.    Kalsec's argument that Fenchem's performance was not vitally different.

Kalsec's reliance on *Hemlock Semiconductor* and *Chainworks* is misplaced. It characterizes this case as a simple instance of market price fluctuation in which Fenchem allegedly refused to perform solely due to reduced profitability. However, neither of those cases involved

circumstances comparable to the outbreak of a war that significantly disrupted global trade and supply chains.

In *Hemlock Semiconductor Operations, LLC v. Solarworld Industries Sachsen GMBH*, the Sixth Circuit rejected the defense of impracticability based on alleged unfair trade practices by the Chinese government, holding that such actions merely caused a shift in market pricing. *Hemlock Semiconductor Operations, LLC v. SolarWorld Indus. Sachsen GmbH*, 867 F.3d 692, 704 (6th Cir. 2017).

Similarly, in *Chainworks, Inc. v. Webco Industries, Inc.*, the District Court found no more than a dramatic rise in the market price for steel, which does not support the defense of impracticability. *Chainworks, Inc. v. Webco Indus., Inc.*, No. 1:05-CV-135, 2006 WL 461251, at *9 (W.D. Mich. Feb. 24, 2006).

Unlike in those cases, the Russia–Ukraine war created a sudden and severe disruption in supply of Tocopherols. These disruptions were not mere cost increases—they affected the feasibility of performance itself. As such, Fenchem's situation is not analogous to the defendants' in *Hemlock* or *Chainworks*.

Further, Kalsec misapplies the case law by attempting to impose an additional requirement—that Fenchem must have been unaware of the possibility that the market price of Tocopherol could fluctuate. No such requirement exists under the doctrine of impracticability. The relevant inquiry is not whether price volatility was conceivable, but whether the magnitude and cause of the disruption—here, the outbreak of war—rendered performance impracticable.

Kalsec also attempts to mislead the Court by omitting a critical fact: the price of sunflower oil, a key raw material for Tocopherol, rose sharply from January 2022 to April 2022 and reached its peak in April 2022. [Ex. 5, 199:25–200:11.]. This surge was not a routine market fluctuation

but a direct consequence of the Russia–Ukraine conflict. Such extraordinary conditions distinguish this case from those cited by Kalsec and reinforce the applicability of the impracticability defense.

Indeed, prior to 2022, neither the supply of Tocopherol nor its raw materials had been significantly affected by the long-standing regional tensions between Russia and Ukraine. [ECF # 35-10, ¶ 5]. Accordingly, Kalsec's argument that Fenchem's performance was not "vitally different" fails in light of the unprecedented and unreasonable burden imposed by the war-related conditions.

### iii.    Kalsec's argument that the price increase would not have a severe impact.

Kalsec cites the 1977 *Gulf Oil Corp.* case to argue that supplying Tocopherols at $31/kg would not severely impact Fenchem's business. However, this argument misstates the standard. The Third Circuit made clear that the real question is whether "the cost of performance has in fact become so excessive and unreasonable" that it warrants relief. *Gulf Oil Corp. v. F. P. C.*, 563 F.2d 588, 599 (3d Cir. 1977).

As shown above, Fenchem paid $61/kg for the Tocopherols, in addition to incurring substantial ancillary expenses, including storage fees and administrative costs. [Ex. 3, 127:10 – 128:8; Ex. 15]. The sharp increase in raw material costs – exacerbated by the Russia-Ukriane war – render Fenchem's performance at $31/kg not merely unprofitable, but commercially impracticable because the cost of performance has become so excessive and unreasonable.

Indeed, Fenchem's expert witness, Rosemary Coates, confirms that from a business and industry perspective, it is commercially unreasonable and impracticable to purchase Tocopherols at $55/kg and sell them at $31/kg. [Ex. 5, 205:17 – 206:8]. Such a scenario is not a mere case of reduced margins, but a clear instance where the cost of performance has become so excessive and unreasonable as to justify excusal.

At a minimum, there exists a genuine dispute of material fact as to whether being required to sell Tocopherols at $31/kg, when Fenchem's cost was $61/kg, satisfies the threshold of excessive and unreasonable performance cost. Summary judgment is therefore inappropriate.

### iv.    Kalsec's argument that Fenchem did not show the real costs of Tocopherol.

Kalsec contends that the higher prices Fenchem paid for Tocopherols in 2022 failed to reflect the true cost, asserting that the amounts included internal profits for its alleged "de facto parent," Biotek. This argument is both factually and legally unsupported.

First, Kalsec unilaterally labels Biotek as Fenchem's de facto parent company, despite the undisputed evidence that Biotek does not own any interest in Fenchem, nor does Fenchem hold any ownership interest in Biotek. [Ex. 3, 23:1–6.] There is no corporate affiliation or ownership relationship between the two entities that would justify treating them as one and the same.

Second, even assuming *arguendo* that Biotek could somehow be characterized as Fenchem's de facto parent, the record shows that Biotek paid approximately $56.5/kg for Tocopherols and related expenses. Fenchem then paid $61/kg for the same, in addition to the shipping, storage, and administrative costs. There is no evidence of internal markups or profit margins being built into these transactions—contrary to Kalsec's speculation.

Accordingly, Kalsec's attempt to discredit Fenchem's cost evidence fails.

### v.    Kalsec's argument that Fenchem cannot show the invasion caused the price increase.

Kalsec attempts to oversimplify the complex market dynamics by arguing that because Tocopherol prices began rising in January 2022—one month before Russia's full-scale invasion of Ukraine—the price increase must be attributable to factors unrelated to the war. This argument ignores basic economic principles and misconstrues how global markets respond to geopolitical threats.

As Fenchem's expert witness explained, raw material prices often begin to rise before an actual disruptive event occurs, as markets respond to anticipated risk, which is well understood in other contexts, such as tariff-related disputes, where markets react in advance of formal implementation due to uncertainty and supply chain risk. [Ex. 5, 16:3 – 19, 90:11 – 22]. Accordingly, the fact that prices rose before the formal invasion does not undermine the causal connection to the war.

Further, Kalsec attempts to make an illogical inference that because the cost of DD oil doubled, the Russia–Ukraine war could not have affected Tocopherol pricing, as neither Russia nor Ukraine is a leading soybean producer. This ignores a critical fact—China, where the Tocopherols were produced, relied heavily on soybean imports from Ukraine. [Ex. 5, 21:2–10]. The disruption of this supply channel directly impacted the cost of raw materials used in manufacturing Tocopherols.

Notably, Kalsec adopts an internal inconsistent position. On one hand, it unreasonably assumes Chinese manufacturers could easily and immediately substitute Ukrainian soybean oil by sourcing from other countries. On the other hand, it contends that it could not quickly find an alternative supplier for tocopherols. [ECF # 1, ¶¶ 12 – 13]. These conflicting arguments undermine the credibility of Kalsec's position and further illustrate its oversimplification of complex supply chain realities.

Kalsec also argues, without offering any supporting evidence, that the price increase of Tocopherols in 2022 was caused by other viables, such as COVID-19 and agricultural issues. Fenchem's expert witness specifically addressed these assertions and testified that there is no evidence indicating that such factors significantly impacted Tocopherol pricing during the relevant period. [Ex. 5, 206:21–207:10].

19

### vi.    Kalsec's argument that Fenchem did not prevent the alleged impracticability.

Kalsec contends that Fenchem failed to take reasonable actions to avoid the alleged impracticability. Specifically, Kalsec argues that Fenchem 1) did not reach out to other potential suppliers of Tocopherols, and 2) did not purchase the entire 35,150 kilograms of Tocopherols immediately upon receiving the Blanket Order. However, neither argument has merits.

As Kalsec admitted in its own Petition, it is difficult to quickly locate an alternative supplier for tocopherols, particularly given that the supply chain was severely disrupted by the Russia-Ukraine war. Even assuming that Fenchem had a duty to seek alternative supplier, that obligation would not alter the facts that 1) Fenchem had no control over the market price of Tocopherols; 2) the market price surged dramatically to 62/kg, and 3) no alternative supplier would offer a price below $62/kg. [Ex. 7, Kalsec 685; Ex. 9, Kalsec 62; Ex. 1, 97:14 – 17; and Ex. 5, 202:22 – 203:3].

Kalsec's claim that Fenchem should have purchased the entire 35,150 kilograms immediately upon receiving the Blanket Order is equally unpersuasive. This argument assumes, without basis, that Fenchem could have foreseen the outbreak of the Russia-Ukraine war months in advance. It also ignores basic commercial realities and imposes an unreasonable expectation that Fenchem make a speculative advance purchase of such a large volume of Tocopherols without confirmed release schedules or quality assurance.

More importantly, Kalsec failed to mention that shortly after the issuance of the Blanket Order, the parties encountered issues concerning the color specifications of the Tocopherols, and it took several months for the parties to resolve those concerns, which prevented Fenchem from acquiring and supplying the product during that period. [Ex. 3, 80:3 – 81:13].

For the above reasons, Kalsec's argument Fenchem did not prevent the alleged impracticability is unsupported and should be rejected.

### vii.   Kalsec's argument that Fenchem has no proof of fair allocation.

Lastly, Kalsec argues that Fenchem has no evidence of a fair allocation of Tocopherols among its customers. Once again, Kalsec attempt to omit a key fact: during discovery, Kalsec received Fenchem's sales records, which show that Fenchem sold Tocopherols on a spot-buy basis to only two other customers, at prices ranging from \$58/kg to \$60/kg—slightly higher than the \$55/kg price offered to Kalsec. [Ex. 3, 105:23 – 106:3].

These records directly refute Kalsec's argument and demonstrate that Fenchem made a fair and reasonable allocation of limited supply, consistent with the requirements of Mich. Comp. Laws § 440.2615(b). Accordingly, Kalsec's claim that Fenchem lacks proof of fair allocation is without merit and should be rejected.

## IV.   CONCLUSION

For the above reasons, this Court should deny Kalsec's motion for summary judgment as to its breach of contract claim and Fenchem's impracticability defense.

DATED: July 4, 2025

<div style="margin-left:40%;">

Respectfully submitted,

By: /s/ Yaou Li
Yaou Li (P86640)
**YL INTERNATIONAL LAW GROUP**
455 E. Eisenhower Parkway, Suite 300
Ann Arbor, Michigan 48108
Telephone: (832) 693-9145
Email: yli@yi-lg.com

*CO-COUNSEL FOR DEFENDANT*

Mingwei Yan (P80734)
**MINGWEI YAN, PLLC**
455 E. Eisenhower Parkway, Suite 300
Ann Arbor, Michigan 48108
Telephone: (732) 800-9912

</div>

Email: yanpllclaw@gmail.com

*LEAD COUNSEL FOR DEFENDANT*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this Defendant's Brief in Support of Its Response in Opposition to Plaintiff's Motion for Summary Judgment complies with the type-volume limitation under W.D. Mich. LCivR 7.2(b)(i). This brief contains 6,473 words of Times New Roman 12-point proportional type. The word processing software used to prepare this brief was Microsoft Word 365.


*/s/ Yaou Li*
Yaou Li

## CERTIFICATE OF SERVICE

I hereby certify that, on July 4, 2025, a true and correct copy of the above and foregoing was served upon the following parties and/or counsel of record in accordance with Federal Rules of Civil Procedure.

*Via E-Service:*
Homayune A. Ghaussi
Timothy H. Smith
Warner Norcross + Judd LLP
2715 Woodward Ave., Suite 300
Detroit, MI 48201
hghaussi@wnj.com
tsmith@wnj.com

*COUNSEL FOR PLAINTIFF*

*/s/ Yaou Li*
Yaou Li