<u>ORAL ARGUMENT REQUESTED</u>

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

---

KALSEC, INC.,

    Plaintiff,

v

FENCHEM, INC. d/b/a FENCHEM USA,

    Defendant.

Case No. 1:23-cv-01137
Hon. Jane M. Beckering

<u>ORAL ARGUMENT REQUESTED</u>

---

Homayune A. Ghaussi (P63028)
Timothy H. Smith (P85528)
Warner Norcross + Judd LLP
2715 Woodward Ave., Ste. 300
Detroit, MI 48201
(313) 546-6000
hghaussi@wnj.com
tsmith@wnj.com

*Attorneys for Plaintiff*

Mingwei Yan (P80734)
Mingwei Yan, PLLC
455 E. Eisenhower Parkway, Suite 300
Ann Arbor, Michigan 48108
(732) 800-9912
yanpllclaw@gmail.com

Yaou Li
YL International Law Group
1077 Westheimer Rd., Suite 1100
Houston, TX 77042
(832) 693-9145
yli@yi-lg.com

*Attorneys for Defendant*

---

**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**I.      Kalsec has proven its breach-of-contract claim.**

This case arises from Fenchem's breach of a sales contract that is governed by the UCC. For an enforceable contract under the UCC, the parties need only reach agreement on quantity. *Barto v. United States*, 823 F. Supp. 1369, 1374 (E.D. Mich. 1993); Mich. Comp. Laws ("MCL") §§ 440.2201, 440.2204. "The price, time, and place of payment or delivery, the general quality of the goods, and any particular warranties may all be omitted." *Barto*, 823 F. Supp. at 1374.

Here, the parties did more than just agree to quantity. In August 2021, the parties reached agreement in the $31 Agreement on quantity (35,150 kgs), price ($31), delivery and shipping terms, quality requirements, and the year for supply. (Mot. 5, 7-8, ECF#51-1, PageID.276, 278-79 (collecting evidence); Betts 54, ECF#51-5, PageID.357; ECF#52-12, PageID.722 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬.) Fenchem also expressly agreed that Kalsec would set delivery dates within 2022 later. (PO 6013522, ECF#51-13, PageID.448; Betts 145, ECF#51-5, PageID.377.) Further, the parties specifically agreed *not* to include a price-fluctuation provision. There is no genuine dispute the $31 Agreement is an enforceable contract requiring performance in 2022. Fenchem's witnesses admitted the contract is "valid." (Betts 257, ECF#51-5, PageID.389; Meng 44, ECF#51-7, PageID.422.)

Faced with these undeniable facts, and their legal repercussions, Fenchem raises everything under the sun to avoid liability. But liability for Fenchem's refusal to perform is inevitable.

   **A.      Fenchem's refusal to deliver as requested does not evince a lack of assent to contract; it evinces Fenchem's breach.**

In 2022, when it came time for Fenchem to deliver the agreed products at the agreed price, Fenchem refused. Now Fenchem seeks to avoid liability by recasting its refusal to release

1

Tocopherols when requested as an insufficient meeting of the minds. That effort fails on the facts and the law.

Sales contracts with open delivery dates are enforceable. MCL § 440.2204(3). Indeed, it is "elementary" that a contract may be formed without "specific details of the time, place, and quantity of delivery." *Precision Rubber Prods. Corp. v. George McCarthy, Inc.*, 872 F.2d 187, 188 (6th Cir. 1989). Thus, "the fact that the parties failed to expressly negotiate such terms as the . . . . date of delivery" in August 2021 "does not serve to invalidate the agreement." *Schneider v. Byrne*, 2005 WL 2291707, at *1 (Mich. Ct. App. Sept. 20, 2005). The $31 Agreement is enforceable because both parties "intended to be bound." *Id.* As Fenchem's witnesses admitted, Fenchem was "of course" obligated to perform under the $31 Agreement in 2022, and "[n]othing" allowed Fenchem "to refuse to perform at the prices [it] agreed to for 2022." (Betts 146, 149, ECF#51-5, PageID.378-79.)

Here the parties did more than simply leave the specific delivery dates open. The parties expressly agreed to a provision providing for Kalsec to specify delivery dates later. (ECF#51-13, PageID.448.) In short, Fenchem's rejection of the releases does not evince a lack of assent to contract; it evinces Fenchem's breach of an existing contract. What Fenchem is attempting to do here is "evade [its] obligations using after-the fact assertions of indefiniteness." *Calhoun Cnty. v. Blue Cross Blue Shield Michigan*, 824 N.W.2d 202, 211 (Mich. Ct. App. 2012). It cannot do so. *Id.*; *M & C Corp. v. Erwin Behr GmbH & Co.*, 143 F.3d 1033, 1039–40 (6th Cir. 1998) ("[E]nforcement of a contract will rarely be denied because of indefiniteness or missing details.").

Equally important, this action does not arise from a quibble over delivery dates. It arises from Fenchem's refusal to deliver at the contracted price. When Kalsec issued the releases,

Fenchem indicated it could provide the Tocopherols "ASAP" as long as Kalsec would pay more. (ECF#51-19, PageID.460 ("[I]f you still want the shipment released to you asap, . . . I will just need a revised PO reflecting the new price.").) Thus, rather than asking for different delivery dates, Fenchem simply (in Fenchem's own words) "withheld shipments until prices had been increased." (ECF#51-33, PageID.518.) As Betts confirmed, the "essence" of his communications to Kalsec was: "if you want to move forward with any volumes from us, we're going to need to get it at [a higher price]." (Betts 174, ECF#51-5, PageID.174.) And Fenchem's corporate representative confirmed that there was no "time in the year 2022 when Fenchem said it would deliver tocopherols at $31/kg." (Corp. Rep. 44, ECF#51-6, PageID.401 ("No, not to Kalsec.").)

For these reasons, Fenchem's arguments do not provide a basis for it "to evade [its] obligations using after-the-fact assertions of indefiniteness." *Calhoun Cnty*, 824 N.W.2d at 211.

B.     **Holding goods hostage for a price increase is repudiation.**

Under Michigan law, a communication "indicating that [the defendant] would not ship [goods] until [plaintiff] paid a price increase[] constitute[s] a repudiation and breach of contract." *Tower Auto. Operations USA I, LLC v. Vari-Form Mfg. Inc.*, 2024 WL 641020, at *7 (E.D. Mich. Feb. 15, 2024). That is what happened here.

Fenchem argues there was no repudiation because, according to Fenchem, it expressed a "continued willingness to perform the future deliveries [i.e., those after the first 13,300 kgs] in its March 10, 2022 communication[]." (Opp. 13, ECF#59-11, PageID.862.) That argument lacks merit for multiple reasons.

First, it ignores Fenchem's repudiation of Kalsec's releases, which entitled Kalsec to "resort to any remedy for breach," including by securing cover goods and seeking damages. MCL §§ 440.2610(b), 440.2712, 440.2713.

3

Second, Fenchem's March 10 email does not indicate *any* willingness to perform at $31/kg at *any* time. Betts wrote that Kalsec's "future demand" beyond the 13,300 kgs would "need to be reviewed at a later date" and that Fenchem was "not able to further discuss those orders currently." (ECF#51-21, PageID.465.) Moreover, it is undisputed that Fenchem never expressed a willingness to perform at $31/kg later in the year. (Corp. Rep. 44, ECF#51-6, PageID.401.) To the contrary, Fenchem continued to demand higher prices. (*E.g.,* ECF#59-12, PageID.993 (proposing $70/kg in late July).)

When a party repudiates, causing the non-repudiating party to take action, the repudiating party can no longer seek to perform its obligations. *See* MCL § 440.2611(1) (explaining that party cannot retract repudiation where the other party has "materially changed his position"). Here, Fenchem repudiated its obligation to deliver at the contracted price when it told Kalsec it would not deliver without a price increase. Kalsec then placed orders with Fenchem, under protest, and another supplier at higher prices to obtain cover. By that point, Fenchem's time for performance had come and gone.

Fenchem's argument that its repudiation did not substantially impair the contract also fails. The $31 Agreement was a fixed price contract intended to allow the parties to plan and budget for 2022. (Roue 33-34, ECF#51-4, PageID.335-36; Buell 203-04, ECF#51-3, PageID.326-27.) By refusing to perform at $31/kg when performance came due, Fenchem deprived Kalsec of the contract's primary benefit.

*Combs v. Int'l Ins. Co.*, 354 F.3d 568 (6th Cir. 2004), involved repudiation through a letter renouncing an insurance policy and does not contradict the authorities regarding extra-contractual price demands. Nor does *Midwest Mobile Diagnostic Imaging, L.L.C. v. Dynamics Corp. of Am.*, 965 F. Supp. 1003 (W.D. Mich. 1997), which involved a buyer cancelling a

4

contract due to delivery of defective goods. *Id.* at 1010. This case does not involve defective or nonconforming goods. For similar reasons, Fenchem's reliance on MCL § 440.2612, which applies when a supplier ships nonconforming goods, is misplaced. This case is not about nonconforming goods.

    **C.**  **Kalsec did not waive its rights to recover damages.**

  Kalsec issued the $62/kg orders under "under protest given Fenchem's unwillingness to meet the terms of our prior agreement" (ECF#51-25, PageID.486), reserving its rights under the $31 Agreement. MCL § 440.1308(a) ("Such words as 'without prejudice,' 'under protest,' or the like are sufficient [to reserve rights]."). Fenchem's argument regarding waiver thus fails. To the extent Fenchem is claiming that Kalsec's reservation was ineffective, it cites no authority, and cases are to the contrary. *Six L's Packing Co. v. Beale,* 524 F. App'x 148, 151 (6th Cir. 2013) ("Rec'd Under Protest" sufficient); *Pro Sales, Inc. v. Texaco,* 792 F.2d 1394, 1400 n.7 (9th Cir. 1986) ("under protest" sufficient).

    **D.**  **Kalsec never agreed to pause the $31 Agreement.**

  Once an agreement is reached, any "modification must be by mutual consent." *Kloian v. Domino's Pizza L.L.C.*, 733 N.W.2d 766, 771 (Mich. Ct. App. 2006). Kalsec never agreed to modify or pause the $31 Agreement.

  Kalsec's witnesses testified that they never agreed to pause the $31 Agreement. (Ex. A, Buell 191, 195; Ex. B, Roue 153.) In support of its "pause" theory, Fenchem relies principally on Betts's testimony. But the same pages of the transcript cited by Fenchem reflect that *Fenchem* wanted to pause the contract—not that *Kalsec* approved one. (Betts 101, ECF#59-11, PageID.988 ("Q. . . . are you referring to Fenchem, not Kalsec? A. Yes."); *see also id.* at 172, PageID.991 (testifying he said "we [Fenchem] want to put the blanket on hold or pause").)

5

Furthermore, Betts could not identify any email, phone call, or conversation in which Kalsec agreed to pause. (Ex. C, Betts 189-90.) Nor could Fenchem's corporate representative identify "any written document or material that Kalsec agreed to pause." (Ex. D, Corp. Rep. 64-65.)

Scrambling, Fenchem points to an email in which Kalsec "internally discussed [] keep[ing] $31/kg tocopherols on hold." (Opp. 11, ECF#59-1, PageID.860.) But Kalsec's internal discussion of a potential strategy is not evidence that Kalsec agreed to pause the contract.

Finally, Fenchem argues that Kalsec's issuance of orders at $62/kg "supports Fenchem's position that the parties mutually agreed to pause performance." (*Id.* at 12, PageID.861.) But Kalsec issued these orders under protest. No reasonable person could construe a reservation of rights as assent to pause performance. Any pause would have defeated the entire purpose of the $31 Agreement's setting a quantity and price for 2022.

### E.    Kalsec issued the $62/kg orders to secure material that should have been provided under the $31 Agreement.

Fenchem repudiated the $31 Agreement by March 10 (at the latest), which forced Kalsec to obtain cover goods. This establishes Fenchem's liability. Fenchem wrongly seeks to evade its breach by claiming that "a genuine dispute of material fact exists" as to whether the $62/kg orders "were made under the Blanket Order or pursuant to a separate agreement." (*Id.* at 10, PageID.859.) But, regardless of how creatively Fenchem characterizes these orders, Fenchem cannot avoid summary judgment on that basis.

Kalsec issued $62/kg orders to cover the shortfall created by Fenchem's repudiation, while preserving its rights under the $31 Agreement. As Buell explained on the page cited by Fenchem, "[t]his was material that was needed and was supposed to be supplied under the blanket PO." (Buell 100, ECF#59-2, PageID.899.) Obviously, Kalsec would not have issued the

$62/kg orders if Fenchem would have performed as obligated. (Buell 200, ECF#51-3, PageID.324.)

Further, whether additional to or otherwise, these $62/kg orders evince Kalsec's damages caused by Fenchem's refusal to deliver at the agreed upon $31/kg price. This refusal forced Kalsec to order material at double the price. Nothing more need be shown for breach and damages.

F.     **Kalsec suffered damages.**

Fenchem suggests in passing in its "Factual Background" that Kalsec has not established damages because, according to Fenchem, "Kalsec has failed to show that it did not pass the[] [increased] costs on to its customers." (Opp. 8, ECF#59-1, PageID.857.) Fenchem has waived this argument by failing to develop it. *Little Traverse Lake Prop. Owners Ass'n v. Nat'l Park Serv.*, 223 F. Supp. 3d 691, 696 (W.D. Mich. 2016) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

Regardless, any such argument fails. Kalsec's margins on subsequent sales are legally irrelevant. Under the UCC, Kalsec may recover the difference between the contract price ($31/kg) and the market price, which, according to Fenchem, was $62/kg. MCL § 440.2713(1) ("[T]he measure of damages for . . . repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price . . . ."). The UCC does not provide for reductions based on potential profits on subsequent sales, *id.*, and Fenchem has cited no caselaw supporting its undeveloped argument.[1]

---

[1] Even if Kalsec's margins on subsequent sales were relevant, it is undisputed that Kalsec was "losing money at $62 per kilogram" "[b]ecause of the contracts" it had with its own customers. (Buell 200, ECF#51-3, PageID.324.) Accordingly, even if MCL § 440.2713 did not foreclose Fenchem's suggestion that Kalsec's margins are relevant, Kalsec would still be entitled to summary judgment.

7

Furthermore, to obtain summary judgment on liability, Kalsec need not prove the extent of its damages. The plaintiff need only prove that it "suffered damages as a result of the breach." *Carrigg v. Gen. R.V. Ctr., Inc.*, 421 F. Supp. 3d 480, 488 (E.D. Mich. 2019). Given that Kalsec was losing money at $62/kg (Buell 200, ECF#51-3, PageID.324), it is undisputed that Kalsec suffered damages, even under Fenchem's erroneous understanding of the law.

### G. Kalsec can recover damages incurred in purchasing Tocopherols from Wilmar.

To limit a potential judgment, Fenchem claims there is an issue of fact regarding whether Kalsec can recover damages incurred in purchasing cover Tocopherols from Wilmar. (Opp. 14, ECF#59-1, PageID.863.) Fenchem specifically complains Fenchem was denied "a fair and reasonable opportunity to perform under the Blanket Order." (*Id.*)

This argument does not withstand scrutiny. Fenchem had repudiated the contract by March 10 by refusing to supply the first 13,300 kgs at $31/kg and refusing to commit to deliveries at any price beyond that date. Kalsec was then entitled to seek cover goods to protect its business and sue for damages later. MCL §§ 440.2610(b), 440.2712. It did so by purchasing goods from Wilmar in March and April 2022. (ECF#51-30, PageID.510; ECF#51-31, PageID.513.)

Fenchem has cited no authority indicating that Kalsec cannot recover damages arising from these purchases. Notably, upon a repudiation, the UCC requires the purchaser to seek cover "without unreasonable delay," MCL § 440.2712(1), which Kalsec did.

## II. Fenchem's impracticability defense fails for numerous reasons.

Prior to entering into the $31 Agreement, Fenchem proposed a price-fluctuation clause be included in the contract because the parties understood raw material and other market fluctuations could affect price. After negotiation, the parties agreed to not include any such

8

provision. (Betts 73, ECF#51-5, PageID.362.) But now, after Fenchem breached the agreed-upon price after the market fluctuated, Fenchem wrongly asks this Court to impose such a provision on the $31 Agreement through a meritless claim of impracticability.

In its Motion, Kalsec identified seven reasons why Fenchem's impracticability defense fails, each of which is sufficient, independently, to reject Fenchem's defense. To survive summary judgment, Fenchem needed to surmount all seven of these obstacles. It has surmounted none.

### A. A drastic price increase was foreseeable.

The Ukraine war was foreseeable. *See* Section II.B. Even if the war had not been foreseeable, Fenchem's defense would fail under *Hemlock Semiconductor Operations, LLC v. SolarWorld Indus. Sachsen GmbH*, 867 F.3d 692 (6th Cir. 2017), because both parties knew the market price for Tocopherols could fluctuate for myriad reasons. This is why the parties considered a price-fluctuation clause in the first place.

The Sixth Circuit held that, even if the parties could not have foreseen the particular event underlying the defense—there, illegal government action, and here, war—the defense still fails if "the possibility that the market price for [the goods] could skyrocket or plummet for a myriad of reasons [was] well within their contemplation." 867 F.3d at 704. The same logic applies here. Indeed, the prices for both components of Tocopherols had skyrocketed in 2021, before the parties finalized the $31 Agreement. (Mot. 6-7, ECF#51-1, PageID.277-78 (surveying evidence).)

### B. The invasion was foreseeable.

As another court concluded, as early as 2018, "even the casual consumer of news would have been aware of the nascent potential for Russia to invade Ukraine," such that "the potential

9

conflict in the region—and the subsequent impact on the price of [raw materials]—was reasonably foreseeable." *Lockheed Martin v. Howmet Aerospace*, 2023 WL 9503471 (N.D. Tex. Dec. 12, 2023). Fenchem emphasizes that *Lockheed* involved preliminary relief. But the difference in procedural posture is immaterial. If anything, the mature posture of this case only hurts Fenchem, as discovery confirmed *Lockheed*'s conclusion. (Mot. 27-28, ECF#51-1, PageID.298-299 (surveying evidence).)

Fenchem's entire argument is based on the subjective feelings of an employee who was not even an employee until two years after Fenchem's performance was due. (Meng 26, ECF#51-7, PageID.419 (testifying he was not employed until August 2024).) Subjective feelings are irrelevant. The question is not whether Fenchem subjectively foresaw an invasion, but whether the event was objectively foreseeable. *Chainworks v. Webco Indus.*, 2006 WL 461251, at *9 (W.D. Mich. Feb. 24, 2006) (defendant "must prove . . . that an unforeseeable event occurred."). "[T]he exemptions of [Section 2-615] do not apply when the contingency in question is sufficiently foreshadowed at the time of contracting . . . ." MCL § 440.2615, cmt. 8.

The main contact from Fenchem, Betts, admitted it was "common knowledge" for "several years" that Russia had been seeking to expand through aggression. (Betts 99-100, ECF#51-5, PageID.368-69.) Likewise, Fenchem's corporate representative admitted it was "common knowledge" that Russia wanted to annex Ukraine. (Corp. Rep. 144, ECF#51-6, PageID.415.) He further admitted that the gathering of 80,000 Russian forces on the border, which occurred in early 2021, would cause a reasonable layperson "to assume that there might be a conflict" or that the conflict was going to escalate from the status quo. (*Id.* at 149, PageID.417.) These admissions bind Fenchem.

To minimize these admissions, Fenchem complains, citing Wikipedia, that its representative did not know that Russia had "denied any intention to invade." (Opp. 15, ECF#59-1, PageID.864.) But Fenchem's Wikipedia citation only bolsters the conclusion that an invasion was sufficiently foreshadowed as of August 2021, as it states:

> "While Russian troops massed on Ukraine's borders [in early 2021], Russia's proxy forces launched thousands of attacks on Ukrainian troops in the Donbas";
>
> There were "more than 90,000 ceasefire violations throughout 2021"; and
>
> "In July 2021, Putin published an essay . . . in which he called Ukraine 'historically Russian lands' and claimed there is 'no historical basis' for the 'idea of Ukrainian people as a nation separate from the Russians' . . .[and] claimed Ukraine never had 'real statehood.'"

https://en.wikipedia.org/wiki/Russian_invasion_of_Ukraine (last accessed July 16, 2025).

### C.    Fenchem cannot show that the cost of performance was excessive.

Fenchem concedes it must show that "the cost of performance has in fact become so excessive and unreasonable that it warrants relief." (Opp. 17, ECF#59-1, PageID.866.) Fenchem contends, however, that there is "a genuine dispute of material fact" as to whether performance at $31/kg met this standard because Fenchem's "cost was $61/kg." (*Id.* at 17-18, PageID.866-67.) But Fenchem has cited no caselaw in support, because the law is otherwise.

Again, it is not enough that Fenchem "may have entered into a contract which eventually become an unprofitable venture." *Chainworks*, 2006 WL 461251, at *10 n.10. Nor is it enough that Fenchem would have sustained substantial losses. *Karl Wendt Farm Equipment v. International Harvester*, 931 F.2d 1112, 1117–18 (6th Cir. 1991) (no impracticability where defendant lost $2 million per day).

Furthermore, "[a] study of the cases using percentages indicate[s] that when prices only double, relief is unavailable." *Application of the Doctrine of Commercial Impracticability:*

*Searching for "The Wisdom of Solomon"*, 135 U. Pa. L. Rev. 1123, 1178 n.42 (1987); *Sabine Corp. v. ONG W., Inc.*, 725 F. Supp. 1157, 1177 (W.D. Okla. 1989) (170% increase not enough because it did "not alter the essential nature of performance"); *Publicker Indus Inc v Union Carbide Corp*, 1975 WL 22890 (E.D. Pa. Jan. 17, 1975) ("We are not aware of any cases where something less than a 100% cost increase has been held to make a seller's performance 'impracticable.'").

For these reasons, Fenchem's argument fails as a matter of law.

> **D. Fenchem's belated evidence of Biotek's costs, which should be disregarded, undermines its impracticability defense.**

Fenchem does not dispute that an impracticability defense fails where the allegedly increased costs include profits for the defendant's foreign affiliate. *E. Air Lines, Inc. v. Gulf Oil Corp.*, 415 F. Supp. 429, 441 (S.D. Fla. 1975). Instead, in an effort to show that its costs did not include profits for Biotek, Fenchem relies on an affidavit from a Biotek employee, whom it never identified in its disclosures (ECF#51-39, PageID.540), and a document that Fenchem never produced in discovery. The Court should disregard the affidavit and the document because Fenchem failed to disclose both. *E.g., Elliott v. Google, Inc.*, 860 F.3d 1151, 1161 (9th Cir. 2017) (district court "properly excluded" evidence disclosed for the first time at summary judgment).

But even if the Court were to consider this belated evidence, it undermines Fenchem's position, because it reflects that Fenchem's allegedly increased costs include profits for Biotek. These materials reflect that Biotek paid $56.5/kg for 13,300kgs of Tocopherols in March 2022, while Fenchem paid Biotek $61/kg. Assuming these are the same Tocopherols that Fenchem supplied to Kalsec (which is unclear because Fenchem's untimely disclosures denied Kalsec an opportunity to investigate), that is a difference of $4.5/kg. And Fenchem has not supplied any documents proving this $4.5/kg difference did not include profits for Biotek.

12

Fenchem also emphasizes that Biotek and Fenchem are distinct legal entities. But, given that Biotek is closely related to, shares employees with, and effectively controls Fenchem (Mot. 3, ECF#51-1, PageID.274 (surveying evidence)), Biotek's desire to preserve profits are not the "kind of 'costs' against which to measure [Fenchem']s hardship . . . under the Uniform Commercial Code." *E. Air Lines*, 415 F. Supp. at 441.

### E. Fenchem cannot show that the war caused the allegedly excessive costs.

Fenchem does not dispute that it must show that the war caused the allegedly excessive costs, but Fenchem asserts that Kalsec has not identified "any supporting evidence" that other variables contributed. (Opp. 19, ECF#59-1, PageID.868.) It bears re-emphasizing that Fenchem bears the burden on its defense. And Kalsec *did* identify evidence that other variables caused Tocopherol prices to rise, meaning Fenchem needed to rule out those variables. It did not do so.

First, Kalsec cited a document from May 2022, on which Fenchem's purported "expert" relied, which reflects that South American yields and COVID restrictions in China contributed to price increases. (ECF#51-37, PageID.532.) Kalsec also quoted the testimony of Fenchem's purported "expert," who admitted that "there were various factors that contributed to rising prices." (Coates 83, ECF#51-38, PageID.534.) Kalsec also noted that (1) Fenchem told Kalsec that the increase from $31/kg to $55/kg in January 2022 (several weeks before the invasion) resulted from increases in the cost of DD oil, which is made from soybeans; and (2) Ukraine is not a major manufacturer of soybeans. (Mot. 31, ECF#51-1, Page.302.)

Trying to patch this hole in its defense, Fenchem retreats to its purported "expert." But she admitted she did not assess "what impact each variable had," nor "break down the respective impact that various variable had on tocopherol pricing." (Coates 83, ECF#51-38, PageID.534.) She cannot carry Fenchem's burden.

13

### F. Fenchem did not take reasonable steps to prevent allegedly excessive costs.

Fenchem does not dispute that it needed to take reasonable steps to avoid allegedly excessive costs. And, as Kalsec explained, there are three reasons why Fenchem failed to do so: Fenchem made no meaningful effort to negotiate lower prices with its sole supplier, Biotek; Fenchem never reached out to any other suppliers; and after it approved the $31 Agreement, Fenchem could have purchased Tocopherols at the market price between September 2021 and January 2022 to protect itself from price increases.

Fenchem does not address the first issue.

As to the second issue, Fenchem speculates that it would not have been able to get a better price. But it cannot prove that because it never tried.

As to the third issue, Fenchem complains that Kalsec "assumes . . . that Fenchem could have foreseen the outbreak of the Russia-Ukraine war." (Opp. 20, ECF#59-1, PageID.869.) Fenchem could have, as discussed above. Regardless, Fenchem's response mistakes the issue. Fenchem knew that costs could shift dramatically for any number of reasons. Thus, if Fenchem wanted to insulate against risk under the fixed price contract, it could and should have bought the subject goods quickly. Fenchem instead rolled the dice, hoping costs might go down.

Fenchem also contends that it was reasonable for it to wait to purchase Tocopherols because, per Fenchem, "after the issuance of the Blanket Order [in August 2021], the parties encountered issues concerning the color specifications of the Tocopherols, and it took several months for the parties to resolve those concerns." (Opp. 20, ECF#59-1, PageID.869.) Tellingly, Fenchem has not cited any document in support. Fenchem relies only on its corporate representative. (*Id.*) But, once confronted with the relevant correspondence, he admitted that

these "color issues" were resolved by September 2, 2021, a couple weeks after the $31 Agreement was approved. (Ex. D, Corp. Rep. 86–87.)

### G. Fenchem admits it did not comply with Section 2-615(b).

Fenchem acknowledges that, to have an impracticability defense, it needed to satisfy the allocation requirements of Section 2-615(b), which requires suppliers to "favor" "contract customers" "regardless of price," MCL § 440.2615(b), cmt. 11.

Fenchem simply notes that, in 2022, it "sold Tocopherols on a spot-buy basis to [] two other customers, at prices ranging from $58/kg to $60/kg." (Opp. 21, ECF#59-1, PageID.870.) But those sales undercut Fenchem's defense, because those were lower than the price Fenchem extracted by repudiating the $31 Agreement. Because Kalsec was a contracted customer, Fenchem needed to favor Kalsec.

## CONCLUSION

In sum, there is no genuine dispute of *material* fact regarding any element of Kalsec's claim, and Fenchem's impracticability theory fails for many reasons.

WARNER NORCROSS & JUDD LLP

Dated: July 18, 2025

By: /s/Timothy H. Smith
Homayune A. Ghaussi (P63028)
Timothy H. Smith (P85528)
2715 Woodward Ave., Ste. 300
Detroit, Michigan 48201
313.546.6000
hghaussi@wnj.com
tsmith@wnj.com

15

## Certificate of Compliance

      I hereby certify that this Plaintiff's Reply Brief in Support of Its Motion for Summary Judgment complies with the type-volume limitation pursuant to W.D. Mich. LCivR 7.2(b)(i). The brief contains 4,300 words of Times New Roman 12-point proportional type. The word processing software used to prepare this brief was Microsoft Word 2016.

## Certificate of Service

      The undersigned certifies that this Plaintiff's Reply Brief in Support of Its Motion for Summary Judgment was filed electronically via the ECF Filing system on this 18th day of July, 2025 which will serve all parties.

                                        */s/ Timothy H. Smith*
                                        Timothy H. Smith